IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MISSOURI

In re:                                                    )
                                                          )
SPRINGFIELD LANDMARKS                                     )   Case No. 10-63128-11
PRESERVATION TRUST,                                       )
                                                          )
                                                          )
            Debtor.                                       )

MOTION TO DISMISS OR, IN THE ALTERNATIVE,
FOR RELIEF FROM THE AUTOMATIC STAY

**COMES NOW** Creditor Guaranty Bank (the "Bank"), by counsel, and moves the Court to dismiss this case pursuant to 11 U.S.C. § 1112(b) or, in the alternative, for relief from the automatic stay pursuant to 11 U.S.C. 362(d), stating as grounds therefor the following:

JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2. Venue lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

BACKGROUND

3. On December 30, 2010, Debtor filed its Chapter 11 bankruptcy petition in this case.

4. Springfield Landmarks Preservation Trust ("Debtor"), a Missouri non-profit corporation, holds the fee interest in the following real estate, located at 325 Park Central East, Springfield, Missouri, commonly known as the Gillioz Theatre and adjoining Morris Building (hereinafter, the "Theatre Buildings"):

> TRACT I: ALL OF THE EAST 25.2 FEET OF LOT TWENTY-FIVE (25) AND THE WEST 64 ½ FEET OF LOT TWENTY-SIX, IN BLOCK SEVEN (7), IN ORIGINAL PLAT OF THE CITY OF SPRINGFIELD, GREENE COUNTY, MISSOURI, BEING THE SAID TRACT OF LAND ALSO DESCRIBED AS BEGINNING ON THE NORTH SIDE OF ST. LOUIS STREET, 160.3 FEET EAST OF THE NORTHEAST CORNER OF ST. LOUIS STREET AND PEARL STREET, NOW ROBBERSON AVENUE, AT THE CORNER OF THE BUILDING FORMERLY OCCUPIED BY THE SEELEY PHOTO SUPPLY COMPANY; THENCE NORTH 117 ½ FEET, TO THE NORTH LINE OF LOT

SPH-2025952-4                                    - 1 -

TWENTY-FIVE (25) IN THE ORIGINAL PLAT OF THE TOWN OF SPRINGFIELD, GREENE COUNTY, MISSOURI; THENCE EAST TO THE WEST LINE OF THE EVERETT LOT; THENCE SOUTH 117 FEET TO THE NORTH LINE OF ST. LOUIS STREET AT THE SOUTHWEST CORNER OF THE EVERETT LOT; THENCE WEST ALONG THE NORTH LINE OF ST. LOUIS STREET TO THE PLACE OF BEGINNING, ALL IN THE CITY OF SPRINGFIELD, GREENE COUNTY, MISSOURI.

TRACT II: A PART OF LOTS THIRTEEN (13) AND FOURTEEN (14), IN BLOCK SEVEN (7), INCLUDING THE ALLEY, IN THE ORIGINAL PLAT OF THE TOWN (NOW CITY) OF SPRINGFIELD, GREENE COUNTY, MISSOURI, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT A POINT 173 FEET EAST OF THE NORTHWEST CORNER OF SAID LOT FOURTEEN (14), AND ON THE SOUTH LINE OF OLIVE STREET; THENCE EAST ALONG THE SAID SOUTH LINE OF OLIVE STREET, 94 FEET, MORE OR LESS, TO THE NORTHWEST CORNER OF THE LOT OWNED BY THE PRESBYTERIAN CHURCH OF THE CITY OF SPRINGFIELD, MISSOURI; THENCE SOUTH ALONG THE WEST LINE OF SAID CHURCH LOT, 117 ½ FEET, MORE OR LESS, TO THE NORTHERN LINE OF LOT TWENTY-SIX (26) IN SAID BLOCK SEVEN (7), IN THE ORIGINAL PLAT OF THE TOWN (NOW CITY) OF SPRINGFIELD, MISSOURI; THENCE WEST ALONG SAID NORTH LINE OF LOTS TWENTY-SIX (26) AND TWENTY-FIVE (25), IN SAID BLOCK SEVEN (7), 94 FEET TO A POINT DUE SOUTH OF THE BEGINNING; THENCE NORTH 117 ½ FEET TO THE PLACE OF BEGINNING, EXCEPTING FROM THE ABOVE, THE WEST 20 FEET, RESERVED FOR ALLEY.

ALSO, ALL BEGINNING AT THE SOUTHWEST CORNER OF LOT SOLD BY C.B. HOLLAND TO GEORGE H. MCCANN ON THE NORTH SIDE OF ST. LOUIS STREET, IN LOT TWENTY-SIX (26), BLOCK SEVEN (7), ORIGINAL PLAT OF SPRINGFIELD, MISSOURI, THENCE WEST TWENTY (20) FEET, THENCE NORTH 117.58 FEET, THENCE EAST TWENTY (20) FEET, THENCE SOUTH 117.58 FEET TO THE PLACE OF BEGINNING, IN THE CITY OF SPRINGFIELD, GREENE COUNTY, MISSOURI.

5. Pursuant to a 75-year Master Lease, dated April 24, 2006, Debtor leased the Theatre Buildings to Netters-Gillioz, Inc., a Missouri corporation; and on that same date, pursuant to a 75-year Master Sublease, Netters-Gillioz, Inc., subleased the Theatre Buildings to Gillioz Restoration Partnership, L.P., a Missouri limited partnership ("GRP").

6. Netters-Gillioz, Inc., is the general partner of GRP.

7. The Master Lease and Master Sublease were executed in connection a $4.3 million Construction Loan Agreement between GRP and the Bank (also executed on April 24, 2006),

pursuant to which the Bank agreed to loan GRP funds to complete major renovations to the Theatre Buildings. Repayment of the loan was to be funded in part by GRP's sale of federal and state historic tax credits.

8. To memorialize its obligation, GRP executed a promissory note in favor of the Bank, in the principal amount of $4,300,000.00. That original promissory note was subsequently amended various times, with a Fifth Amendment to Amended and Restated Promissory Note in the amount of $5,300,000.00 being executed on March 10, 2008.

9. A true and correct copy of the Fifth Amendment to Amended and Restated Promissory Note with the underlying Amended and Restated Promissory Note (hereinafter the "Note") is attached as Exhibit A and incorporated by reference.

10. Among other things, the Note is secured by the following:

   a. A Secured Guaranty Agreement (as amended), pursuant to which Debtor guarantied GRP's obligations under the Note, a true and correct copy of which is attached as Exhibit B; and

   b. An Amended and Restated Leasehold Deed of Trust and Security Agreement With Subordinated Fee Interest (the "Deed of Trust"), recorded in Book 2007 at Page 21927-07 in the office of the Greene County, Missouri, Recorder of Deeds, a true and correct copy of which is attached as Exhibit C. True and correct copies of related UCC Financing Statements are attached as Exhibit D. Pursuant to the Deed of Trust, Debtor, GRP and Netters-Gillioz, Inc., granted the Bank a first position security interest in their respective interests in the Theatre Buildings and related personal property.

11. Pursuant to the Construction Loan Agreement and the Note, GRP was required to make quarterly payments of accrued interest and to pay over all historic tax credit proceeds.

12. GRP repeatedly failed to make its quarterly interest payments on a timely basis.

13. The last significant payment that GRP made under the Note was on March 10, 2008, when it made a payment of $65,175.26.[1]

14. On June 10, 2008, the Note fully matured and came due and, as of that date, the total principal amount owed was $4,365,899.30.

15. Since that date, the Bank has received state historic tax credit proceeds in the net amount of $715,407.95, as follows:

| | | |
|---|---|---|
| a. | December 18, 2008 | $68,485.33 |
| b. | December 11, 2009 | ($19,500.00)[2] |
| c. | February 22, 2010 | $458,576.77 |
| d. | June 25, 2010 | $151,733.80 |
| e. | July 8, 2010 | $56,112.05 |
| | Total | 715,407.95 |

16. Aside from these state historic tax credit proceeds, neither Debtor, nor GRP, nor any other party on their behalf has made any payments under the Note since June 20, 2008. Consequently, as of December 30, 2010, when Debtor filed this action, Debtor and GRP were obligated to the Bank under the Note in the following amounts:

| | | |
|---|---|---|
| a. | Principal | $3,650,491.35 |
| b. | Interest[3] | $962,087.00 |
| c. | Late charges | $12,393.13 |
| d. | Fees and costs[4] | $64,969.50 |
| | Total | $4,689,940.98 |

---

[1] GRP also made a $3,466.97 payment on June 20, 2008, for accrued late fees; but neither GRP nor Debtor has made any payments since that time.
[2] Guaranty Bank was forced to pay GRP's accountant to complete tax credit certification to be filed with the state because GRP had not paid its invoices from the accountant.
[3] Interest accrues on this amount at the rate of $937.97 per day.
[4] This amount does not include attorney's fees and costs associated with a foreclosure sale scheduled for December 31, 2010, or related attempts to negotiate a repayment agreement.

17. No additional state or federal tax credit proceeds are anticipated.

18. Based upon information from Debtor, the appraised value of the Theatre Buildings in September 2010 was approximately $3.6 million. That value has almost certainly changed for the worse, due at least in part to the announcement on November 30, 2010, that the long-planned $29 million renovation of the Heer's building, just west of the Theatre Buildings, has been put on indefinite hold. Generally, property values in downtown Springfield appear to be unstable or declining.

19. On December 11, 2010, in an attempt to recover at least part of what it is still owed under the Note, the Bank commenced the non-judicial foreclosure of the Theatre Buildings and related personal property by publishing and serving a Notice of Trustee's Sale of Real Estate and Notice of Public Sale of Personal Property Under Uniform Commercial Code (the "Sale").

20. The Sale was scheduled for 2:00 p.m. Friday, December 31, 2010.

21. On Thursday, December 30, 2010, at 4:43 p.m., Debtor filed its bankruptcy petition, along with a companion Chapter 11 case filed at 5:02 p.m. by GRP (Case No. 10-63130).

22. Based upon the latest information that Debtor and GRP have provided to the Bank, those entities appear to have the following average income and expenses:

    a. GRP purportedly has monthly income averaging $23,000.00 (from rental income, ticketing, concessions, event services) and monthly expenses averaging $23,000.00 (cost of food, show expenses, overhead, administrative costs, etc.).

    b. Debtor appears to have monthly rental income of approximately $14,500.00 from rental agreements with three tenants for portions of the Theatre Buildings – Ozarks Technical Community College at $6,281.67 per month; Kenneth-Lane

Enterprises LLC at $3,917.00 per month; and DBD Gourmet, Inc., at $4,307.00 per month. Debtor's expenses are unknown at this time.

23. According to information disseminated to the media by spokespersons for Debtor and GRP in December 2010, the Theatre was "operating in the black – except for the outstanding loan."[5] However, there appears to be no conceivable way that Debtor or GRP can propose a feasible, confirmable plan to repay that outstanding loan.

## DISMISSAL OF CASE

24. Pursuant to 11 U.S.C. § 1112(b), a court may dismiss a Chapter 11 bankruptcy case for cause, including a debtor's bad faith or lack of good faith in filing its petition. *See, In re Huckfeldt*, 39 F3d 829, 832 (8th Cir. 1994); *In re Padilla*, 222 F.3d 1184, 1192-1193 (9th Cir. 2000).[6]

25. In addition, a bankruptcy court has the inherent judicial power to dismiss a case for bad faith. *See, e.g., In re Huckfeldt*, 39 F3d 829 (8th Cir. 1994).

26. In deciding whether bad faith exists in a given case, a court must consider all the underlying facts and circumstances. *In re Edwards*, 140 B.R. 515, 517 (Bankr. W.D. Mo. 1992); *In re Grieshop*, 63 B.R. 657, 662-663 (Bankr. N.D. Ind. 1986). Among the factors or questions that courts consider when determining if bad faith exists are the following:

    a. Does the debtor have few or no unsecured creditors?

    b. Are there few debts to non-moving creditors?

    c. Was the bankruptcy petition filed on the eve of foreclosure?

---

[5] Springfield News-Leader, December 16, 2010, "Effort to Save Gillioz Theatre Heating Up," by Wes Johnson, attached as Exhibit E.
[6] *See also, In re Mitchell*, 357 B.R. 142, 152-154 (Bankr. C.D. Calif. 2006) (noting that courts may also dismiss Chapter 7 bankruptcy cases for bad faith pursuant to 11 U.S.C. § 707(b)(3)(A)).

      d. Is the property to be foreclosed the sole or major asset of the debtor?

      e. Is there any real possibility of reorganization?

      f. Is the debtor's income insufficient to operate?

      g. Prior to bankruptcy, was the debtor being pressured by any non-moving creditors?

      h. Does reorganization essentially involve the resolution of a two-party dispute?

      i. Did the debtor file the bankruptcy case solely to create the automatic stay?

*Id.*, 63 B.R. at 663.

27. "Bad faith is found when the cumulative effect of . . . individual factors together paint a factual picture that leads to the inescapable conclusion that use of the bankruptcy laws by the debtor is inappropriate." *In re Forest Hill Funeral Home & Memorial Park*, 364 B.R. 808, 820 (Bankr. E.D. Okla. 2007), *citing In re Gunnison Ctr. Apartments, LP*, 320 B.R. 391, 399-400 (Bankr. D. Colo. 2005). Indeed, a debtor's inability to propose a feasible plan, in and of itself, can warrant dismissal of a Chapter 11 bankruptcy case. *Edwards*, 140 B.R. at 517.

28. Given the facts and circumstances of this case, there is strong cause for dismissal.

29. First, Debtor has almost no unsecured creditors. According to Debtor's List of Creditors Holding 20 Largest Unsecured Claims, the list only includes the following[7]:

      a. Elise Crain                         $133,474.95

      b. Guy and Dorothy Mace[8]          $40,000.00

      c. Jim D. Morris                    $15,000.00

      d. Philip Rothschild               $5,000.00

---

[7] Debtor has also listed the Bank and the City of Springfield as unsecured creditors, apparently based upon Debtor's determination that the collateral pledged to these two creditors is not worth as much as the debts owed to each. However, the Bank and the City of Springfield both hold duly recorded and perfected security interests in the Debtor's property, with the City's security interest being subordinate to that of the Bank's.

[8] It was the Bank's understanding that this debt had already been paid.

30. Consequently, there are few debts to any nonmoving creditors; and, except for the Bank, there is no indication that Debtor was being pressured by any of its creditors to repay its debts.

31. Debtor filed this case literally on the eve of foreclosure for the sole purpose of triggering the automatic stay and halting the Sale. As the Debtor's president reportedly said immediately after this case was filed: "The only tool we have to stop foreclosure is to file Chapter 11 bankruptcy. . . . We had no choice."[9]

32. In this regard, it is noteworthy (a) that Debtor's bankruptcy petition can, at best, be characterized as a bare-bones pleading; (b) that Debtor has not filed a motion for authorization to use cash collateral; (c) that Debtor has not filed a motion under 11 U.S.C. § 366 related to utility service; and (d) that Debtor has not moved to consolidate this case with the companion case filed by GRP (Case No. 10-63130), which needs to be done immediately. Clearly, Debtor's only focus and purpose in filing this case was to stop the Sale.

33. Furthermore, the Theatre Buildings and personal property to be sold represent Debtor's sole asset; and any proposed reorganization will simply involve the resolution of what is, in reality, just a two-party dispute between the Bank and Debtor.

34. Finally, there is no possibility that Debtor can propose a confirmable plan of reorganization. As noted, GRP is just barely breaking even from an operational standpoint without any on-going debt service payments. Moreover, Debtor's monthly revenue of about $14,500 is not even sufficient to cover accruing interest owed to the Bank. The reality of the matter is that Debtor and GRP have only been able to survive since March 2008 because they have made no payments to the Bank. In short, there is simply no prospect of *any* viable reorganization and, accordingly, Debtor's Chapter 11 bankruptcy case should be dismissed.

---

[9] Springfield News-Leader, December 31, 2010, "Bankruptcy Filing to Halt Gillioz Sale," by Mike Penprase, attached as Exhibit F.

## RELIEF FROM STAY

35. In the event that the Court decides not to dismiss this case as a bad faith filing, it should grant the Bank relief from the automatic stay in this case, pursuant to 11 U.S.C. § 362(d).

36. Under 11 U.S.C. § 362(d)(1), relief from stay can be granted for cause, including filing a petition in bad faith. *In re Sparklet Devices*, 140 B.R. 515, 517 (Bankr. E.D. Mo. 1993).[10] "Generally, the factors used to demonstrate bad faith are the same whether the court is considering a motion for relief or a motion to dismiss for lack of good faith." *Id.* In addition, as explicitly stated in 11 U.S.C. § 362(d)(1), lack of adequate protection also represents cause for relief from the automatic stay. Such cause exists in this case.

37. First, there are numerous indicia that the Debtor filed this case in fad faith:

   a. Debtor has essentially no unsecured creditors;

   b. There are few debts to any nonmoving creditors;

   c. Except for the Bank, there is no indication that Debtor was being pressured by any of its creditors;

   d. Debtor filed this case less than 24 hours before the foreclosure sale, for the sole purpose of triggering the automatic stay and halting that sale;

   e. The Theatre Buildings and related personal property represent Debtor's sole asset;

   f. Any proposed reorganization will involve the resolution of a two-party dispute between the Bank and Debtor; and

---

[10] *See also, In re Grieshop*, 63 B.R. at 662; *In re Novak*, 103 B.R. 403 (Bankr. E.D. N.Y. 1989); *In re Conference of African Union First Colored Methodist Protestant Church*, 184 B.R. 207 (Bankr. D. Del. 1995); *In Arnold*, 806 F.2d 937 (9th Cir. 1986); *In re Dixie Broadcasting, Inc.*, 871 F.2d 1023 (11th Cir. 1989); and *In re Lotus Investments, Inc.*, 16 B.R. 592 (Bankr. S.D. Fla. 1981).

    g. There is no possibility that Debtor can propose a confirmable plan, and no indication that those who filed this case on Debtor's behalf had any such plan in mind.

38. Second, lack of adequate protection can also establish cause for relief from the automatic stay. Here, based on information from the Debtor, the appraised value of the Theatre Buildings in September 2010 was approximately $3.6 million. That value has almost certainly changed for the worse, due at least in part to the announcement on November 30, 2010, that the long-planned $29 million renovation of the Heer's building, just west of the Theatre Buildings, has been put on indefinite hold because the Heer's developer was unable to secure adequate financing. More generally, property values in downtown Springfield are currently unstable at best.

39. Relief from stay is also justified under 11 U.S.C. § 362(d)(2), because Debtor has no equity in the Theatre Buildings, and the Theatre Buildings are not necessary to an effective reorganization.

40. As can be established by Debtor's own recent appraisal and by earlier appraisals, it is clear that Debtor has no equity in the Theatre Buildings and that the Bank is undersecured. The more significant question is whether or not the Theatre Buildings are necessary to Debtor's reorganization. The Bank's position is that the Theatre Buildings are not necessary.

41. As the Supreme Court stated in *United Savings Association of Texas v. Timbers of Inwood Forest Associates, LTD.*, 484 U.S. 365, 375-376, 108 S.Ct. 626, 632-633 (1988):

> Once the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the *debtor* to establish that the collateral at issue is "necessary to an effective reorganization." See § 362(g). What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*. This means . . . that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

(Emphasis in original; quoting lower court of appeals in the case.)

42. Relief from stay based upon a debtor's inability to show that an effective reorganization is in prospect or to show that there is a reasonable possibility of a successful reorganization in a reasonable time can be granted immediately after the bankruptcy filings. *Id.*, footnote 2.

43. In this case, Debtor simply cannot meet this burden. At most, Debtor can expect rental income of $14,500.00 per month from three tenants. Even assuming that Debtor has no expenses (unlikely) and that Debtor pays all of this income to the Bank, that would only amount to half of the interest that accrues each month on the Note. Furthermore, there is no indication that GRP or any other party can fund any kind of reorganization plan[11] and there are no prospects of any additional state or federal tax credit proceeds.

44. Consequently, the Court should enter an order immediately granting the Bank relief from the automatic stay to proceed with the foreclosure sale of the Theatre Buildings and associated personal property.

WHEREFORE, for the foregoing reasons, Guaranty Bank respectfully requests that the Court enter an order dismissing the Chapter 11 bankruptcy petition and case of Springfield Landmarks Preservation Trust; or, in the alternative, that the Court grant Guaranty Bank immediate relief from the bankruptcy stay, permitting the Bank to foreclose its interest in the Theatre Buildings and personal property and declaring that the Bank shall be and is deemed to have satisfied all contractual and statutory obligations to provide notice to Debtor regarding Debtor's default under the Note and the Bank's intention to proceed with foreclosure under the Deed of Trust.

---

[11] Despite what appeared to have been heroic and highly publicized fundraising efforts in the weeks leading up to the Sale, the so-called "Save the Gillioz" fundraiser generated only $200,000. *See*, Springfield News-Leader, December 31, 2010, "Bankruptcy Filing to Halt Gillioz Sale," by Mike Penprase.

**Husch Blackwell LLP**

/s/ J. Michael Bridges
J. Michael Bridges                    #41549
901 St. Louis St., Suite 1800
Springfield, MO 65806
Telephone: 417-268-4000
Facsimile: 417-268-4040
E-mail: michael.bridges@huschblackwell.com
**Attorney for Creditor Guaranty Bank**

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing was served electronically on all creditors, parties in interest or their attorneys of record, according to the Court's notice of electronic filing and that a copy was served by regular mail, postage prepaid, to all parties listed below on January 7, 2011.

David E. Schroeder, Esq.
1524 E. Primrose St., Suite A
Springfield, MO 65804
Telephone: 417-890-1000
Facsimile: 417-886-8563
E-mail: bk1@dschroederlaw.com
**Attorney for Debtor**

Jerry L. Phillips, U.S. Trustee's Office
400 E. 9th St., Rom 3440
Kansas City, MO. 64106
Telephone: 816-512-1940
Facsimile: 816-512-1967
E-mail: jerry.l.phillips@usdoj.gov
**Attorney for U.S. Trustee**

City of Springfield
PO Box 8368
Springfield, MO 65801

Elise Crain
PO Box 455
Ozark, MO 65721

Guy and Dorothy Mace
591 Village
Incline Village, NV 89451

Jim D. Morris
420 W. Walnut Lawn #B
Springfield, MO 65807

Philip Rothschild
901 S. National
Springfield, MO 65807

Springfield Landmarks Preservation Trust
1835 E. Republic Road #200
Springfield, MO 65804

Gillioz Restoration Partnership, LP
1835 E. Republic Road #200
Springfield, MO 65804

/s/ J. Michael Bridges
Attorney